**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**Mary Anderson Cummings,**

        **Plaintiff,**

**v.**                                      **Case No. 11-2268-JWL**

**BNSF Railway Company,**

        **Defendant.**

## MEMORANDUM & ORDER

Plaintiff filed suit against defendant, her former employer, alleging that defendant terminated her employment in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. This matter is presently before the court on defendant's motion for summary judgment (doc. 24). As explained below, the motion is granted in part and denied in part.

## I.    Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Mary Anderson Cummings began her employment with defendant BNSF Railway Company in July 1989. Beginning in 2003, plaintiff worked as an Off In force Reduction (OIFR) clerk, a job that required her to fill in for absent employees on various positions. OIFR clerks could be assigned to one of three shifts: 7am to 3pm (first shift); 3pm to 11pm (second shift); or 11pm to 7am (third shift). Four or five other employees also worked as OIFR clerks, and the order in which they were called for open positions was based on

seniority pursuant to a collective bargaining agreement.   Approximately two hours before the beginning of a shift, a crew caller would contact the OIFR clerks to inform them whether any vacancies needed to be filled.  If an OIFR clerk was "first out" on the list, meaning he or she was at the top, the OIFR clerk could call the crew caller to determine whether any vacancies existed.  If an OIFR clerk was unable to fill a position, they would "lay off" the position.  An OIFR clerk could lay off work due to illness, a death in the family, FMLA leave, and a number of other reasons. However, if an OIFR clerk was ready, willing and able to work but defendant did not have any vacancies, the employee would still get paid so long as he or she had yet to put in 40 hours for the week.  If the employee called in sick or exercised FMLA leave, he or she would be considered "unavailable" and would not receive "protection pay" even if defendant had no vacancies to which the employee could be assigned.  Protection pay, then, provided an incentive for an employee to delay laying off sick or FMLA until he or she learned whether any vacancies existed and the record reflects that defendant had concerns about OIFR employees waiting to layoff until after being called to fill a job.

During her employment, plaintiff requested and was provided with FMLA leave many times for multiple reasons.  This included time off for her own serious health conditions, as well as time off to care for family members with serious health conditions.  Beginning in June 2007, plaintiff was certified for intermittent FMLA leave due to a sleep disorder that precluded her from working if she had not gotten enough sleep over the preceding 24-hour period or if she had taken medication for sleep.  According to plaintiff, when she took her sleep medication, she could not work for at least 8 hours.  Plaintiff's certification for intermittent FMLA leave

continued throughout the year 2009.  Between January 1, 2009 and November 16, 2009, plaintiff "laid off FMLA" on 34 occasions.

Viewed in the light most favorable to plaintiff, the record reflects that George McCoy, the then-manager of labor relations and manpower planning responsible for making sure that shifts were fully staffed, believed that plaintiff had a "habit" of calling in to check on vacancies before laying off sick or FMLA in an effort to either "job shop" or maximize her chances of receiving protection pay.  In October 2007, Mr. McCoy sent an e-mail to other members of management stating his belief that plaintiff "has been less than truthful when laying off FMLA or injury on duty."  In February 2008, Mr. McCoy sent an e-mail to another member of management explaining that plaintiff had called the crew caller to inquire about vacancies and was told that she was first out with one vacancy showing.  Plaintiff then laid off FMLA.  The crew caller was mistaken and, in fact, no vacancy existed.  When plaintiff learned the following day that no vacancy had existed, she contacted the crew calling office and asked to have her FMLA leave removed from her record because she did not have to layoff in light of the fact that no vacancies existed.  Mr. McCoy summarized by stating in his e-mail that plaintiff "has a habit of calling in checking to see if [she] will work, and if so, will layoff sick or FMLA."

In his e-mail, Mr. McCoy also referenced that plaintiff had been disciplined on one occasion in 2006 and another occasion in 2007 for "misrepresentation of facts" in connection with laying off FMLA or sick.  By way of background, defendant's clerical employees are subject to a progressive discipline chain, which begins with low-level coaching and counseling, and moves on to a formal reprimand followed by "record" suspensions (suspensions that do not involve actual time off or loss of wages) of varying lengths.  As a final warning, defendant will

3

issue an employee a "Level S" disciplinary violation, the highest-level violation short of dismissal, which typically includes a three-year probationary period during which any additional infractions may result in the termination of the employee's employment.   In April 2009, plaintiff received a Level S violation, which included a 30-day record suspension and a three-year probationary period for "misrepresentation of facts" when she attempted to lay off work under the FMLA over a two-day period in March 2009.   Plaintiff, at the suggestion or instruction of her union representative, waived her right to challenge the discipline and signed an acknowledgement accepting it.   She does not recall the circumstances surrounding the April 2009 discipline.   It is uncontroverted that Mr. McCoy, in March 2009, had instructed his crew callers to "make an entry in the daily log" as to the time and reasons for any calls from plaintiff.

In issuing the April 2009 discipline, defendant advised plaintiff that the discipline was based in part on her disciplinary history, which included a September 2006 Level S violation for "misrepresentation of the facts" when attempting to lay off work under the FMLA in July 2006 and a June 2007 discipline for "misrepresentation of the facts" when she attempted to lay off "injury on duty" in April 2007.   Plaintiff does not recall the circumstances surrounding these other disciplinary violations, she waived her right to challenge them—again at the suggestion or instruction of her union representative—and she signed an acknowledgement accepting both disciplines.   The April 2009 discipline cautioned plaintiff that if she committed another serious rule violation during the three-year probationary period, she could be subject to dismissal.

On October 8, 2009, plaintiff received a call from a crew caller assigning her to a third-shift vacancy, beginning at 11pm that evening and concluding at 7am on October 9, 2009. Plaintiff believed she should not have been called for a vacancy on that date because she had

4

already been assigned to a job earlier that week and she believed she should have remained with that job for the duration of the vacancy, including any rest days.  Plaintiff argued with the crew caller about the situation over the course of multiple telephone conversations and ended up laying off sick for the shift.  Plaintiff laid off sick and asserts that she had a dental appointment scheduled for the following morning, October 9, 2009 at 9am.  She also contends that she had an infection and "problems" with her teeth that made her unable to work that evening.  Plaintiff was not certified for FMLA leave for dental issues and she did not consider her absence to be covered under the FMLA.   Accordingly, she made no mention of the FMLA during her discussions with the crew caller and she does not now contend that this absence qualified or should have qualified as FMLA leave.

On Friday afternoon, October 9, 2009, Mr. McCoy sent an e-mail to other members of management in which he stated that this was "another case of [plaintiff] misrepresenting the facts regarding her layoff sick on October 8, 2009 for a 3rd shift crew hauling assignment."  In his email, Mr. McCoy expressed his belief that plaintiff was not, in fact, sick, but laid off sick only after she was informed that she had been released from the other assignment and that she was first out for another vacancy on the 3rd shift.  Mr. McCoy concluded the e-mail by stating his desire to move forward with an investigation and, in light of her prior disciplines, dismissal if supported by the results of the investigation. Thereafter, Mr. McCoy asked plaintiff to bring in a doctor's note substantiating her October 8 absence.  In response, plaintiff brought a note from the University of Missouri at Kansas City (UMKC) School of Dentistry certifying that she was at the school for "dental treatment" from 9am to 12pm on October 9, 2009.  Although plaintiff concedes that the shift she had been asked to work ended two hours prior to her appointment,

she notes that UMKC is "quite a distance" from Leavenworth, Kansas and she was relying on family members for transportation.

Because the document provided by plaintiff did not explain or indicate that plaintiff was unable to work the October 8, 2009 shift, Mr. McCoy issued a letter to plaintiff on October 14, 2009 rejecting the note from UMKC and seeking additional information. Specifically, Mr. McCoy asked plaintiff to provide by October 22, 2009 "satisfactory evidence . . . regarding [her] illness that prohibited [her] from performing her duties" on the shift defendant asked her to work. She did not provide the requested verification at any time.

In the meantime, on November 10, 2009, plaintiff called the crew caller to check on possible vacancies for the third shift. The crew caller informed plaintiff that a third-shift vacancy did exist for a crew hauling position, a job that requires driving. After being told she was being assigned to the crew hauler job, plaintiff stated that she wanted to lay off and take one day of intermittent FMLA leave. The record does not reflect whether plaintiff laid off FMLA because she had taken medication or because she had not gotten sufficient sleep. It is reasonable to infer, however, that plaintiff had not taken sleep medication because she testified that had the November 10, 2009 vacancy been a non-driving job, she could have worked.

On some occasions, plaintiff would use FMLA leave because she felt that she could not perform any job due to a lack of sleep. On other occasions, however, she felt as if she were only unable to perform a position that required driving. Accordingly, on the occasions when she believed she was only unable to perform a driving job, plaintiff testified she would first call to inquire about vacancies before deciding whether she needed to exercise intermittent leave under the FMLA. It is undisputed, however, that the intermittent FMLA leave for which plaintiff was

6

certified did not require a determination as to whether the job was a driving job or a desk job; she was entitled to the intermittent leave if she had not gotten the requisite amount of sleep in the prior 24-hour period or had taken sleep medication regardless of the particular vacancy.

According to defendant, a record of plaintiff's attendance reflects that on other occasions plaintiff called to check on vacancies and still exercised FMLA leave despite the fact that the job she was being assigned to fill did not involve driving.  In her deposition, plaintiff could not explain why she would have called in to check vacancies and laid off under the FMLA if the job did not involve driving.  The record reflects that defendant, particularly Mr. McCoy, believed that plaintiff was "job shopping" and did not elect to lay off FMLA until she found out that the vacancy was a third shift driving job.  Mr. McCoy conducted an investigation into plaintiff's November 10, 2009 layoff and ultimately recommended the termination of plaintiff's employment based on plaintiff's "misrepresentation of facts" surrounding her FMLA layoff on November 10, 2009.  In recommending termination, Mr. McCoy noted that plaintiff has "misrepresented the facts when laying off both sick and under FMLA over several years."

On December 17, 2009, defendant terminated plaintiff's employment based on plaintiff's November 10, 2009 layoff.  Her last day of employment with defendant, then, was December 16, 2009.  Earlier that week, on December 14, 2009, Mr. McCoy issued a letter to plaintiff advising her that her failure to provide verification for her October 8, 2009 absence would be considered a failure to comply with instructions in violation of BNSF rules and that an investigation would proceed.  According to defendant, despite the fact that defendant had already terminated plaintiff's employment based on her November 10, 2009 layoff, defendant pursued dismissal proceedings for the October 8-9, 2009 layoff because it had already started

that process under the terms of collective bargaining agreement.  Thus, on April 15, 2010, following an investigation required by the collective bargaining agreement, defendant formally terminated plaintiff's employment based on the October 8-9, 2009 layoff.  According to a letter issued by defendant to plaintiff, defendant terminated plaintiff's employment due to her failure to substantiate her layoff on the October 8-9, 2009 shift and, in assessing the discipline, defendant considered plaintiff's personnel record.

Plaintiff's union appealed the termination on her behalf to a neutral arbitrator with the Public Law Board.  While that appeal was pending, defendant terminated plaintiff's employment a third time based on plaintiff's failure to timely report a work-related injury.  In April 2010, after she no longer worked for defendant, plaintiff learned that the hearing test van was in town. It had been over two years since she had her hearing tested.  The April 2010 hearing test revealed some hearing loss.  On April 30, 2010 plaintiff reported to defendant that she had sustained an "occupational injury" of hearing loss.  In her report, plaintiff stated that the "Date of Injury" was November 2009.  According to plaintiff, she did not discover the hearing loss until April 2010, but she listed the injury as November 2009 because she had not worked for defendant since the end of 2009.  In June 2010, after an investigative hearing, defendant notified plaintiff that her employment was terminated for failing to timely report the injury in violation of company policy.  Plaintiff's supervisor, Susan Elevier, testified that in her experience (she worked for defendant for 34 years), she could not recall any other employee who had been terminated three times.

In July 2011, the arbitrator upheld defendant's decision to terminate plaintiff's employment. Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and makes inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, the "nonmoving party must present more than a scintilla of evidence in favor of his position." *Id*. (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008)).

## III.    Discussion

The FMLA allows a qualified employee to take up to twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1006 (10th Cir. 2011) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under [the FMLA]." *Sabourin v. University of Utah*, 676 F.3d 950, 957 (10th Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)).  The Circuit has recognized that this provision of the FMLA gives rise to an "interference" or "entitlement" theory of recovery. *Twigg,* 659 F.3d at 1006 (citations omitted).  The FMLA also forbids an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  *Sabourin*, 676 F.3d at 957 (quoting 29 U.S.C. § 2615(a)(2)).  The Tenth Circuit has construed this provision of the FMLA as creating a retaliation theory of recovery.  *Twigg*, 659 F.3d at 1004.

Because it believes that the pretrial order is unclear as to whether plaintiff is setting forth an interference claim or a retaliation claim, defendant moves for summary judgment on both theories of recovery.  For the following reasons, the court concludes that plaintiff has never set forth or preserved an interference theory of recovery in this case and it declines to address the merits of that theory here.  In the pretrial order, plaintiff, as part of her factual contentions, states unequivocally that she "was terminated from her employment in retaliation for exercising her rights under the FMLA."  In a subsequent portion of the pretrial order, plaintiff identifies only one theory of recovery that she is pursuing under the FMLA and, in doing so, sets forth the elements of an interference claim.  Because it is not reasonable to conclude that plaintiff intended in this section of the pretrial order to abandon the retaliation claim that she expressly discussed in her contentions, the court can only conclude that plaintiff mistakenly set forth the elements of an interference claim when she intended to set forth the elements of a retaliation claim.

This reading of the pretrial order is supported by the parties' submissions on summary judgment.  As noted earlier, defendant moves for summary judgment on both theories of recovery out of an abundance of caution.  In her response brief, plaintiff sets forth the elements of an interference claim at the outset of her argument, but she does not substantively address an interference theory of recovery in any respect.   Moreover, she summarizes this case in her brief as one concerning only whether defendant retaliated against plaintiff for exercising her FMLA rights.   Consistent with that summary, plaintiff's response focuses exclusively on whether defendant's proffered reasons for plaintiff's discharge are pretextual—an analysis that applies only to FMLA retaliation claims. *See Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (FMLA interference claims not analyzed under *McDonnell Douglas*).  The court construes plaintiff's submission, then, as a concession that she does not intend to pursue an interference theory of recovery.  Indeed, in its reply brief, defendant highlights that plaintiff's failure to address an interference claim reflects that she does not intend to pursue such a claim and, despite ample time to do so, plaintiff has not corrected defendant's understanding of plaintiff's intent.  In short, the court concludes that only a retaliation theory of recovery has been preserved and pursued by plaintiff.

The court turns, then, to analyze defendant's motion for summary judgment on plaintiff's retaliation claim.  Plaintiff's FMLA retaliation claim is analyzed under the burden-shifting framework for employment-discrimination claims that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sabourin v. University of Utah*, 676 F.3d 950, 958 (10th Cir. 2012).  To establish a prima facie case of retaliation, plaintiff must prove that she engaged in a protected activity; defendant took an action that a reasonable employee would have found

materially adverse; and there exists a causal connection between the protected activity and the adverse action. *Id*. If she establishes a prima facie case, defendant must then produce a "legitimate, nonretaliatory reason for its termination decision. *Id.* If defendant produces such a reason, the burden shifts back to plaintiff to "show that there is a genuine dispute of material fact" as to whether defendant's explanations for terminating her employment are pretextual. *Id.*

A.      *December 2009 Termination*

In its motion for summary judgment, defendant does not dispute that plaintiff can establish a prima facie case of retaliation with respect to her December 2009 termination. It begins its argument by setting forth its legitimate, nonretaliatory reasons for terminating plaintiff's employment—namely, plaintiff's misuse of intermittent FMLA leave when she inquired as to vacancies before declaring her need to exercise FMLA leave. In essence, defendant contends that plaintiff's employment was terminated because she engaged in "job shopping." The court finds that defendant has carried its burden of production here.

Viewing the evidence in the light most favorable to plaintiff, the court concludes that plaintiff has come forward with sufficient evidence of pretext to survive summary judgment. Quite obviously, Mr. McCoy, for at least two years prior to plaintiff's termination, believed that plaintiff was routinely abusing or manipulating the system by calling and inquiring about vacancies prior to laying off sick or FMLA. It is undisputed that in March 2009 Mr. McCoy placed plaintiff under extra scrutiny by requesting that crew callers log every call from plaintiff both in terms of the time of the call and the stated reason for the call. It is reasonable to infer,

then, that Mr. McCoy "had it in" for plaintiff—perhaps justifiably so, but a jury could conclude otherwise.

Mr. McCoy's bias against plaintiff, coupled with other circumstances surrounding her termination, could permit a reasonable jury to find in plaintiff's favor.  Significantly, no one disputes that plaintiff in fact was entitled to FMLA leave on November 10, 2009.   While defendant contends that plaintiff's termination was warranted because plaintiff's intermittent leave was not job-specific such that she should not have been calling to inquire about specific vacancies, the record reflects that plaintiff, on numerous prior occasions and without consequences, first inquired about vacancies before laying off FMLA.  In other words, plaintiff had engaged on other occasions in what defendant terms "job shopping" in connection with her intermittent FMLA leave.  Defendant does not explain why this occasion warranted different treatment, leaving the inference that defendant had simply "had enough" of plaintiff's use or misuse of her intermittent leave.  A reasonable jury may also find it unusual that defendant elected to penalize plaintiff for her apparent willingness to work a non-driving job if one was available despite her entitlement to "non-job-specific" FMLA leave.  Complicating matters more is the fact that Mr. McCoy was the sole hearing officer in the investigation of plaintiff's November 10, 2009 layoff such that defendant's stated reasons for plaintiff's termination rise and fall on the credibility of an individual with a demonstrated bias against plaintiff.

In sum, the totality of the circumstances surrounding plaintiff's December 2009 termination are such that a jury must decide whether plaintiff's exercise of her FMLA rights resulted in the termination of her employment.

B.      *April 2010 Termination*

With respect to plaintiff's April 2010 termination, defendant first contends that summary judgment is appropriate to the extent plaintiff suggests that defendant terminated her employment in retaliation for plaintiff's laying off sick on October 8-9, 2009.  According to defendant, plaintiff cannot establish a prima facie case of retaliation for such a claim because it is beyond dispute that plaintiff did not engage in protected activity under the FMLA when she laid off sick for the dental appointment.  The court agrees that this claim is foreclosed under the FMLA as plaintiff did not suggest at the time that the leave qualified as FMLA leave and she does not suggest it now.  *See Ney v. City of Hoisington, Kansas*, 264 Fed. Appx. 678, 682 (10th Cir. 2008) (plaintiff did not engage in protected activity when she took sick leave and insisted that the FMLA did not apply; the mere use of sick leave does not implicate the FMLA—it "comes into play when there is a serious health condition that prevents the employee from performing her work").  Defendant's motion for summary judgment on this aspect of plaintiff's claim is granted.

To the extent that plaintiff suggests that her April 2010 termination was in retaliation for plaintiff's exercising her rights under the FMLA on multiple prior occasions, defendant does not dispute that plaintiff has established a prima facie case of retaliation.[1]  Rather, defendant contends only that plaintiff cannot cast doubt on defendant's legitimate, nonretaliatory reason for plaintiff's April 2010 termination.  According to defendant, it terminated plaintiff's

---

[1]In an introductory paragraph of its opening brief, defendant states that "[n]othing about these three separate decisions to terminate [plaintiff's] employment had any causal connection to her efforts to exercise rights pursuant to the FMLA."  Defendant, however, does not raise the "causal connection" issue when discussing whether plaintiff was terminated for her October 8, 2009 absence in retaliation for utilizing FMLA leave on other occasions.

employment based on plaintiff's failure to provide appropriate documentation substantiating her absence on October 8, 2009.  Plaintiff, however, has come forward with evidence that this reason is unworthy of belief.  Significantly, Mr. McCoy sent an e-mail to other members of management within 24 hours of plaintiff laying off sick in which he expressed his belief that plaintiff was job shopping—that she laid off sick only after she was informed that she had been released from the other assignment and that she was first out for another vacancy on the 3rd shift.  Mr. McCoy concluded the e-mail by stating his desire to move forward with an investigation and, in light of her prior disciplines, dismissal if supported by the results of the investigation.  Viewed in the light most favorable to plaintiff, then, the October 9, 2009 e-mail reflects Mr. McCoy's intent and desire to terminate plaintiff's employment before he received any note at all from plaintiff.  In other words, the e-mail, coupled with Mr. McCoy's demonstrated bias against plaintiff, suggests that Mr. McCoy would vigorously pursue termination (based on his belief that she was job shopping) regardless of whether plaintiff substantiated her absence.

The court also believes that summary judgment is inappropriate with respect to this termination decision because the record reflects that the decision is at least somewhat intertwined with the earlier termination decision stemming from plaintiff's November 10, 2009 layoff.  While Mr. McCoy directs plaintiff to substantiate her October 8, 2009 absence no later than October 22, 2009, the record does not reflect that Mr. McCoy or anyone else took any action toward pursuing a dismissal based on the October 8, 2009 absence until December 14, 2009—the same week that defendant terminated plaintiff's employment for the November 10, 2009 layoff.  To the extent that a jury might find that defendant decided to pursue dismissal

15

stemming from the October 8, 2009 absence in an effort to "buttress" its termination arising from the November 10, 2009 layoff, the court believes that the jury—who must already consider the termination arising from the November 10, 2009 layoff—should consider this termination as well.  This is particularly true where plaintiff has not set forth three separate retaliation claims arising from the three separate terminations, but has set forth a single claim of retaliation based on the termination of her employment.

C.      *June 2010 Termination*

For several reasons, the court concludes that it cannot resolve on summary judgment any claim concerning plaintiff's June 2010 termination.  To begin, the parties devote only a small fraction of their respective briefs addressing plaintiff's third termination and neither party marshals the evidence relating to this termination decision through the lens of *McDonnell Douglas*.  Moreover, plaintiff has not set forth separate retaliation claims for each of the termination decisions.  Rather, she sets forth a single claim of retaliation based on the termination of her employment.  Thus, the court does not believe it is appropriate to single out the June 2010 termination for analysis in a vacuum without regard for the arguably relevant facts leading up to that termination, including the facts surrounding her prior terminations.  This is particularly true where plaintiff's supervisor testified that in her vast experience with defendant, she has never heard of an employee being terminated three times.  Thus, because the court has already concluded that a jury must resolve disputed factual issues surrounding plaintiff's December 2009 and April 2010 terminations, the court believes it is appropriate for

the jury to hear the evidence concerning the June 2010 termination as part of the totality of the circumstances surrounding the final months of plaintiff's employment.

In so deciding, the court notes that, contrary to defendant's suggestion, a finding on summary judgment that any one of defendant's termination decisions was lawful would not save defendant from a trial in this case. According to defendant, it cannot be liable for violating plaintiff's FMLA rights if it proves that plaintiff ultimately would have been lawfully terminated in any event. The case cited by defendant in support of this argument, *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002), is distinguishable as it speaks to an interference theory of recovery where the defendant defends the claim on the ground that it would have made the same termination decision regardless of the request for or taking of FMLA leave. Here, of course, the issue is whether a subsequent termination decision was lawful—not whether the same termination decision was also motivated by lawful reasons.

To be sure, if the court decided on summary judgment that no reasonable jury could conclude that the first termination decision—December 2009—was in retaliation for plaintiff's exercise of her FMLA rights, then neither the court nor a jury would need to resolve any issues regarding any subsequent termination decisions. But because the court has decided that a jury must decide whether the first termination decision violated the FMLA, this case must go to trial regardless of whether the court were to conclude that defendant was entitled to summary judgment on the April 2010 or June 2010 termination decisions because plaintiff might still be entitled to backpay from December 2009 through the time when defendant lawfully terminated her employment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 24) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 26th day of July, 2012, at Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge

18